John T. Jasnoch (Calif. Bar No. 281605)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway Suite 3300
San Diego, CA  92101
Telephone: 619-233-4565
jjasnoch@scott-scott.com

*Attorneys for Plaintiff*

[Additional counsel on signature page.]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| RAY HEMRY, on Behalf of Himself and All Others Similarly Situated<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE, LLC and ALPHABET INC.,<br><br>Defendants. | Case No.: _____<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Ray Hemry ("Plaintiff") complains upon knowledge as to himself and his own actions and upon information and belief as to all other matters against Defendants Google LLC ("Google") and Alphabet Inc. ("Alphabet") and collectively, Defendants, as follows:

## SUMMARY OF ALLEGATIONS

1.      Google permitted certain harmful apps on Google Play that enabled theft of users' funds, even as Google assured consumers that all apps on its platform undergo review and are safe and secure.  This gave users the false impression that the malicious apps had been properly vetted by Google.

2.      Google offers a tightly controlled selection of apps via Google Play.  By strictly managing which apps are available on Google Play devices, Google has made itself the gatekeeper for app safety and reliability in its ecosystem.  Google repeatedly assures consumers that Google Play apps are rigorously reviewed, trustworthy, and secure, even claiming that financial apps on Google Play originate from properly licensed financial institutions and comply with all laws.

3.      By promoting Google Play as safe and trustworthy, Google cultivates consumer confidence that directly boosts its sales.  Users are more likely to choose Google Play-compatible phones and tablets (instead of rival brands) because they believe Google's platform offers a more secure app experience.  If Google did not give these strong safety assurances, consumers might be less inclined to buy Google Play-compatible devices or download apps from Google Play, seeing other platforms as equally safe alternatives.

4.      These representations foster consumer trust, which, in turn, incentivizes consumers to purchase Google Play store-enabled devices over competing brands.  Google's campaign to promote the safety and trustworthiness of its Google Play store directly contributes to increased sales of apps within the store, as consumers reasonably believe that apps downloaded from the Google Pay Google Play provide a safer and more secure user experience.  Without this assurance of security, fewer consumers would be inclined to purchase Google Play-enabled devices, as they might perceive other smartphones or tablets as equally secure or better suited to meet their needs.  Likewise, without this assurance of security, fewer consumers would download apps on Google Play store.

5.      Google's touting of Google Play's safety and legitimacy serves two goals: it makes Google's overall ecosystem more attractive and helps sell Google's hardware and software.  Google Play isn't just an app marketplace, it's central to Google's competitive edge in phones, tablets, and mobile operating systems.  By convincing users that Google Play is secure, Google benefits financially in multiple ways: from paid app purchases, in-app transactions, and even "free" apps that make Google's devices more appealing.  In short, Google's business growth and strategy rely heavily on maintaining the perception that apps on Google Play are safe.

6.      Plaintiff and Class members placed their trust in Google's assurances branding Google Play as "a safe and trusted place" when downloading what they believed were legitimate digital asset trading apps.  In reality, those apps were fraudulent "spoofing" tools designed solely to steal money: they harvested users' account credentials and diverted the victims' fiat and cryptocurrency into the scammers' own accounts.  Unaware of this scheme, and relying on Google's longstanding promises that Google Play apps are vetted, safe, and law-abiding, Plaintiff and others obtained these apps from Google Play.  They deposited funds and initially saw what looked like genuine trading activity and account growth.  But eventually, accounts were frozen and all their invested funds vanished, stolen in a cryptocurrency swindle known as a "pig butchering" scam.

7.      Google represented and cultivated an overall impression that apps from Google Play could be trusted as safe and secure thanks to Google's strict review process.  In truth, that impression was false and misleading.  By misrepresenting the safety of its platform and by failing to correct or prevent the fraud, Google led Plaintiff and Class members to download "pig butchering" scam apps and thereby suffer heavy financial losses.  Such conduct violates California's consumer protection statutes, including the Unfair Competition Law (Bus. & Prof. Code §17200, *et seq.*).

8.      Through this class action, Plaintiff asks the Court to halt Google's unlawful practices and to compel Google to reimburse Plaintiff and Class members for the losses they sustained due to Google's misconduct.

9.      The full scope of Google's misconduct, including scam app creator identities, is concealed and lies within Google's exclusive possession.  Given the surreptitious and secretive

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

nature of the scams conducted on Google Play, more evidence supporting the allegations in this Complaint will be uncovered after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

10.    This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C §1332(d), because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative class members defined below and minimal diversity exists because the majority of putative class members are citizens of a state different than Defendants.

11.    This Court has general personal jurisdiction over Defendants because their principal place of business is in California. Additionally, Defendants are subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in this State.

12.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial portion of the conduct described in this Complaint was carried out in this District. Furthermore, Defendants Google and Alphabet are headquartered in this District and subject to personal jurisdiction in this District.

## PARTIES

**A.    Plaintiff**

13.    Plaintiff Ray Hemry is a natural person and citizen of the State of California and a resident of San Diego, California.

**B.    Defendants**

14.    Defendant Google LLC ("Google") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94025.

15.    Defendant Alphabet, Inc. ("Alphabet") is a Delaware corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1600

Amphitheatre Parkway, Mountain View, California 94043.  Alphabet is the successor issuer to, and parent holding company of, Google LLC.  Alphabet owns all the equity interests in Google LLC.[1]

## **SUBSTANTIVE ALLEGATIONS**

**Google and Google Play**

16.     Google ranks among the world's largest providers of mobile and tablet applications via its well-known Google Play store, which is the primary way that users of Android phones download and access third-party Apps.

17.     Google has deliberately built up its brand as a provider of dependably safe apps.  Over time, Google has cultivated the perception that Google Play is a carefully managed marketplace and that every app purportedly undergoes strict review to meet Google's security criteria.  This consistent messaging has led consumers to inherently trust that any app available on Google Play is, by default, safe to use.

18.     In recent years, Google has repeatedly emphasized that user safety and trust are top priorities for Google Play.  For example, a 2024 security blog post opens by stating: "A safe and trusted Google Play experience is our top priority".[2]

19.     Likewise, Google's own Play Console Help pages declare, "We're committed to making Google Play a safe and trusted experience for everyone".[3]  This mirrors the marketing language used by Google to assure users that downloading apps from the Play Store is reliable and secure.  Google has reinforced that "Safety and security are foundational to everything we build at Google Play," noting that they continually invest in protections to ensure "safe, high-quality apps"

---

[1]     During the 2015 reorganization, certain of Google LLC's business segments were spun off and separated into independent entities under the ownership of Alphabet.  At various times during the Class Period, certain of the business segments re-merged with Google LLC under one corporate structure.  Accordingly, Alphabet and Google LLC both have been named as defendants in order to ensure all corporate entities who may be found liable for any portion of the alleged wrongdoing are part of this lawsuit.

[2]     Steve Kafka, *et al.*, *How we fought bad apps and bad actors in 2023*, GOOGLE SECURITY BLOG (April 29, 2024), https://security.googleblog.com/2024/04/how-we-fought-bad-apps-and-bad-actors-in-2023.html.

[3]     *Keeping Google Play safe for users and developers*, PLAY CONSOLE HELP (June 29, 2023), https://support.google.com/googleplay/android-developer/answer/13721042?hl=en.

on the store.[4]  Google even encourages users to "download with confidence," highlighting its safety measures.[5]

20.    Google represents that all apps on Google Play undergo extensive vetting through both automated scanning and human review.  According to Google, over 10,000 safety checks are run on every app before release or updates, and apps are continuously re-checked post-release.[6]

21.    Google purportedly leverages machine learning to scan for malware or policy violations at scale, while "teams of human reviewers" manually inspect apps to enforce policies.[7] Google explicitly notes that it removes or rejects apps that violate guidelines "so that users have greater trust in the apps they download".[8]

22.    Google frequently promotes Play Protect, its mobile security suite, as a guardian against malware.  Google claims Play Protect "scans 200B+ apps daily" across users' devices to detect Potentially Harmful Applications.[9]

23.    In marketing materials, Google highlights that Play Protect performs "over 10,000 safety checks on each app" on the Play Store to weed out malware and vulnerabilities.[10]  These checks occur before an app is listed and continue "after release" as apps update.  By leveraging Google's threat intelligence, the company asserts it can "help keep you safe" from malware or "digital traps" when using Google Play.

24.    Google's developer policies explicitly ban apps that could facilitate financial harm or fraud.  "We don't allow apps that expose users to deceptive or harmful financial products and

---

[4]    Suzanne Frey, *6 ways Google Play helps keep you safe*, Google The Keyword (May 6, 2025), https://blog.google/products-and-platforms/platforms/google-play/keeping-google-play-safe-2025/.

[5]    *Id.*

[6]    *Id.*

[7]    Play Console Help, *supra* n.3.

[8]    *Id.*

[9]    LinkedIn, Royal Hansen's Post, https://www.linkedin.com/posts/royal-hansen-989858_how-we-kept-the-google-play-android-app-activity-7290801959509409792-Wz3L/.

[10]    Frey, *supra* n.4.

services," the Play Developer Policy states.[11]  This broad rule covers investment scams, Ponzi schemes, or apps with misleading financial promises.  Google requires any app offering financial services (including cryptocurrency trading or wallets) to comply with all local laws and regulations in the regions it targets.[12]

25.    Developers must "complete the Financial features declaration" and may be asked to provide licenses or documentation to prove legal compliance.  In effect, Google represents that it only permits legitimate, regulated financial service apps on the Play Store, as part of protecting users.

26.    Google's representations of safety and security in the applications offered in the Google Play store have been made continuously and were a focal point of widespread advertising and marketing representations made by Google regarding Google Play.

27.    Google directly profits from the Play Store, charging developers a one-time registration fee to be listed in the store and taking additional service fees on all digital purchases made in Play Store Apps.  This service fee ranges from 15% to 30%.

28.    In addition, drawing consumers to its selling forum, as opposed to other fora, has considerable business advantage to Google, as it encourages consumers to purchase Google products or make other Play Store purchases, and dissuades consumers from purchasing other devices.

29.    Because Plaintiff reasonably believed that Google thoroughly reviews applications before it allows them on Google Play, and in reliance upon Google's representations that Google Play apps are safe and secure, Plaintiff purchased Google Play-enabled hardware and downloaded apps from Google Play, including one or more of the applications at issue here.

30.    The scammers that perpetrated the fraud against Plaintiff and Class members through the Google Play app did so specifically because the app being in Google Play would lend credibility to the scheme.  The fraudsters knew that Google advertises Google Play as being a safe and

---

[11]    Developer Program Policy, PLAY CONSOLE HELP (Jan. 28, 2026), https://support.google.com/googleplay/android-developer/answer/16852659?hl=en.

[12]    *Id.*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

trustworthy platform, and they used those representations to their advantage in order to carry out the fraud.

31.    With Google's representations in mind, Plaintiff downloaded apps reasonably trusting that the apps would be safe, legitimate, and suitable for conducting secure financial transactions.  Instead, Plaintiff was met with digital asset fraud, finding himself a victim of schemes that Google's promises of safety should have prevented.

32.    By appearing in Google Play, these scam apps gain an air of legitimacy that lowers the guard of potential victims.  Scammers develop Android apps available on Google Play specifically to bolster their credibility, knowing that users are "more inclined to trust a platform that has been vetted and approved by a reputable app store."[13]  The presence of these fraudulent apps on Google Play was not incidental; it was a deliberate strategy to "significantly contribute[] to their perceived credibility" in the eyes of the targets.[14]

33.    Sophisticated digital actors, such as Google, are well-aware of the threat of these schemes.  Google knew, or should have known, that these types of frauds exist and should have protected Plaintiff and Class members against these types of frauds.  Despite representations that Google takes Google Play security seriously, that its customers can trust what is available in Google Play, and that Google Play apps used to trade cryptocurrency meet all relevant legal requirements, Google allowed these fraudsters to place their apps for download in Google Play and caused great harm to Plaintiff and Class members.

**Plaintiff's Experience**

34.    In October 2025, Plaintiff joined an online investment discussion group whose purported objective was to share stock recommendations and investment strategies and to leverage the combined investment resources of the group.  At the behest of an investment firm purportedly

---

[13]    Trend Research, *Unmasking Pig Butchering Scams and Protecting Your Financial Future*, https://www.trendmicro.com/vinfo/us/security/news/cybercrime-and-digital-threats/unmasking-pig-butchering-scams-and-protecting-your-future (last visited Feb. 12, 2026).

[14]    Jagadeesh Chandraiah, *Fraudulent "CryptoRom" trading apps sneak into Apple and Google app stores*, Sophos (Feb. 1, 2023), https://www.sophos.com/pt-br/blog/fraudulent-cryptorom-trading-apps-sneak-into-apple-and-google-app-stores.

named Goldmanre Prosperity Group, the discussion turned to a new investment app known as "Watsans Exchange." Watsans Exchange purported to be an "All-in-One Mobile Super App" that was to "Redefine Global Trading".[15]

35.    Watsans was a finance/trading app that appeared on the Google Play Store in October 2025, published by a developer named "5.0★ Recommended 6407+".



36.    Plaintiff and other group members were encouraged to join the Watsans app in a chance to win $10,000 cash, Apple gear, gold bars, and other exclusive rewards. Plaintiff was also told to download the Digicoins app only from the Google Google Play or the Google Play Store.

37.    Plaintiff has been an avid user of Google products and services for more than two decades. He trusted apps from Google Play because of his experience with Google products, his experience downloading and using other apps on Google Play, and the overall impression Google has cultivated among its customers, that apps on Google Play are vetted, safe, and trustworthy. This confidence arose from Google's long-standing commitment to marketing Google Play as a secure platform, where all apps meet rigorous safety standards. He was also assured by Google's

---

[15]    Watsans Exchange, *Watsans Exchange Unveils All-in-One Mobile Super App to Redefine Global Trading Experience,* GLOBENEWSWIRE (Oct. 6, 2025), https://www.wjbf.com/business/press-releases/globenewswire/9540553/watsans-exchange-unveils-all-in-one-mobile-super-app-to-redefine-global-trading-experience.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

representations on Google Play that its apps could be trusted and were secure and safe as alleged above.

38.     In reliance on this impression Google has cultivated over time, including Google's representations regarding the safety and security of Google Play apps, and based on his belief that the Watsans app downloaded from Google's Google Play was safe and secure, Plaintiff downloaded Watsans from Google Play in or around the month of October 2025, and began transferring money and buying cryptocurrency he believed he could use to conduct legitimate digital trades on the Watsans app.

39.     Plaintiff downloaded the Watsans app onto his Google Play-enabled device. Plaintiff would not have purchased his Google Play-enabled device or spent as much money on the Google Play store or on his Google Play-enabled device if he had known the truth about Google's representations that its apps were not safe or trustworthy.

40.     Plaintiff's initial deposits were in relatively small amounts. Before he began transferring larger amounts to Watsans he looked for yet additional assurance from Google regarding the legitimacy and safety of Google Play apps. To this end, Plaintiff reviewed Google's guidelines and review process for apps available from Google Play, including the particular standards Google purportedly requires for financial related apps as alleged above. Google's representations regarding the safety and security of apps on Google Play further convinced Plaintiff the Watsans app was safe for his investments. He began to deposit in larger amounts. Plaintiff's reliance on Google's representations was reasonable because the representations he relied on concern the safety and security of apps from Google Play, and Plaintiff relied upon Google's representations for these purposes.

41.     Whenever Plaintiff attempted to make a withdrawal, he would receive an error message and that his withdrawal was delayed. Later, the Watsans app was non-functional and non-responsive. Plaintiff later discovered the Watsans app was not legitimate or in compliance with legal requirements, contrary to Google's representations, it was not safe and could not be trusted,

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

and it did not comport with Google's represented standards and vetting processes for a financial app.

42.     The Watsans app was part of a "pig butchering" scam and the money that Plaintiff had invested, by sending funds to an application downloaded directly form Google's Play Store, was gone.  As a direct result of Google's process for reviewing the Watsans app on its Google Play and Plaintiff's reasonable reliance on Google's representations assuring him the app had been vetted, was safe, and could be trusted, Plaintiff was injured and lost his investment.  Contrary to Google's representations and stated processes for correction, Plaintiff and other users of Google Play were never notified by Google that the Play Store contained dangerous apps used for fraud and malicious activity.  Because of the false and deceptive material misrepresentations at issue, Plaintiff also overpaid for his Google Play-enabled device.

43.     On information and belief, the Watsans App was removed from the Google Play Store in January 2026.  The Watsans App is just one in a long line of scam apps that were available on Google Play.  The developer that created Watsans, "5.0★+Recommended+6407," released other fraudulent financial apps on Google Play.

44.     As an initial matter, the developer's name is styled to look like a 5-star recommended label, which is intended to mislead users.  Play Store listed the contact email as omphalos360@gmail.com, with a location of Zambia.  Other apps from this same developer include Nexusx and BlockWaveinc Max, substantially similar financial fraud apps were also made available through Google Play.  Google Play has also allowed scam apps from similar developer aliases like "5.0★ Recommended 8477+", "5.0★ Recommended 9091+", "5.0★ Recommended 23136+", "5.0★ Recommended 40729+", "5.0★ Recommended 3680+", "5.0★ Recommended 57807+", "5.0★ Recommended 10832+", "5.0★ Recommended 9892+", "5.0★ Recommended 35267+", and "5.0★ Recommended 1291+".

45.     This swarm of accounts operated in parallel, and when one was removed, another would launch a similar app under a new number.  The scam app descriptions are nearly identical across all accounts, often word-for-word.  Phrases like "provides users with professional and convenient applications, committed to creating a high-quality and convenient service platform"

appear in every app's description.  Some apps even include a "Three major characteristics" list (24/7 usage, simple interface, quick start in 3 minutes) indicating a shared template or developer kit. Almost all apps were categorized into the Finance category.

46.     Harmful scam apps associated with these overlapping accounts include "VicbitMax", "IPXN Max", "USHK", "Wisdomelite Genius", "EXOP Trade", "Vctcoinese Pro", "PoinBK Pro" and many others.

## **CLASS ACTION ALLEGATIONS**

47.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> All persons who downloaded a cryptocurrency trading or investment app from the Google Play Store within the relevant statutory period to the date notice is sent to the Class and whose funds were stolen from the app by the app developers or agents working on their behalf (the "Class Period").[16]

48.     Excluded from each Class are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

49.     **Ascertainability:** Membership of the Class is defined based on objective criteria, and individual members will be identifiable from Defendants' records.

50.     **Numerosity:** The exact number of members of the Class is unknown and unavailable to Plaintiff at this time, but individual joinder in this case is impracticable.  The Class likely consists of thousands of individuals, and their membership can be identified through Defendants' records.

---

[16]     Plaintiff has defined the Class based on currently available information and hereby reserves the right to amend the definition of the Class, including, without limitation, the Class Period.

51.   **Predominant Common Questions:** The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members.  Common questions for the Class include, but are not limited to, the following:

   a.   whether Defendants engaged in the conduct alleged herein;

   b.   whether Defendants' conduct constituted violations of state consumer protection laws;

   c.   c. whether Plaintiff and the other Class members are entitled to damages, restitution, or other monetary relief and, if so, in what amount;

   d.   d. whether injunctive relief is appropriate, including corrective advertising regarding the safety of Google Play apps, and the form thereof;

   e.   whether Google breached its Terms of Service, Community Standards, and Advertising Policies by allowing impersonation, fraud, or deceptive practices;

   f.   whether Google was unjustly enriched by revenues from the scam apps and whether disgorgement/restitution is appropriate on a class-wide basis; and

   g.   whether injunctive and declaratory relief requiring enhanced app-creation verification, proactive scam filtering, prompt takedowns, and related safeguards is appropriate for the Class as a whole.

52.   **Typicality:** Plaintiff's claims are typical of the claims of the other members of the proposed Class.  Plaintiff and Class members' claims arise from the same course of conduct by Google, namely, permitting certain harmful apps on Google Play that enabled theft of users' funds, even as Google assured consumers that all apps on its platform undergo review and are safe and secure.

53.   **Adequate Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class.  He has retained competent counsel who is experienced in complex litigation and class actions, including consumer protection cases.  Plaintiff has no interests that are antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.  Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf

1  of the members of the Class, and they have the resources to do so.  Neither Plaintiff nor his counsel

2  have any interests adverse to those of the other members of the Class.

3      54.    **Substantial Benefits:** This class action is appropriate for certification because class

4  proceedings are superior to other available methods for the fair and efficient adjudication of this

5  controversy and joinder of all members of the Class is impracticable.  This proposed class action

6  presents fewer management difficulties than individual litigation, and provides the benefits of single

7  adjudication, economies of scale, and comprehensive supervision by a single court.  Class treatment

8  will create economies of time, effort, and expense and promote uniform decision-making.

9      55.    Plaintiff reserves the right to revise the foregoing class allegations and definitions

10  based on facts learned and legal developments following additional investigation, discovery, or

11  otherwise.

12              **CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS**

13      56.    California's substantive law applies to the claims of Plaintiff and the Class.  Google's

14  user agreements contain governing-law and forum-selection clauses that (for U.S. users) select

15  California law and a California forum for disputes arising out of use of the services.

16      57.    By choosing California law for the resolution of disputes in the agreement, Google

17  concedes that it is appropriate for this Court to apply California law to the instant dispute.

18      58.    Further, California's substantive laws may be constitutionally applied to the claims

19  of Plaintiff and the Class under the Due Process Clause, U.S. CONST. amend. XIV, §1, and the Full

20  Faith and Credit Clause, U.S. CONST. art. IV, §1.  California has significant contact, or significant

21  aggregation of contacts, to the claims asserted by Plaintiff and all Class members, thereby creating

22  state interests that ensure that the choice of California state law is not arbitrary or unfair.

23      59.    Defendants' United States headquarters and principal place of business are located

24  in California.  Defendants also own property and conduct substantial business in California.

25  Therefore, California has an interest in regulating Defendants' conduct under its laws.  Defendants'

26  decision to reside in California and avail itself of California's laws, and to engage in the challenged

27  conduct from and emanating out of California, renders the application of California law to the claims

28  herein constitutionally permissible.

60.    California is also the state from which Defendants' alleged misconduct emanated. This conduct similarly injured and affected Plaintiff and all other Class members.

61.    The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiff and the proposed Class, and California has a greater interest in applying its laws here than any other interested state.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Unfair Competition – Cal. Bus. & Prof. Code §17200, *et seq*.**
**(On Behalf of Plaintiff and the Class)**

62.    Plaintiff re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

63.    Plaintiff and Defendants are "persons" within the meaning of the UCL, Cal. Bus. & Prof Code §17201.

64.    The UCL defines unfair competition to include any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof Code §17200.

65.    Google has engaged in unlawful business acts and practices within the meaning of the UCL "unlawful" prong by virtue of its violations of Civil Code §§1572, 1573, 1709, 1711, 1770(a)(5), (7), (9) and the common law.  Plaintiff reserves the right to allege other violations of law which constitute unlawful business acts or practices under the UCL.

66.    As a result of engaging in the conduct alleged in this Complaint, Defendants have also violated the UCL prohibition against unfair business acts or practices.  Defendants' unfair conduct alleged in this Complaint is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers because consumers have lost substantial amounts of money using Google Play apps that were not legitimate, vetted, or safe as represented by Google.  There is no utility or legitimate business purpose for Google's conduct in that Google by its express representations and long-term campaign promises that apps from Google Play are legitimate, safe, and secure and can be downloaded with confidence because of Google's vetting process and security standards.

However, because Google has prioritized profit over oversight, Google fails to adequately vet predatory, potentially devastating "pig butchering" cryptocurrency scam apps and makes them available to download despite its continuing misrepresentations that the apps in Google Play are vetted, safe and trustworthy.

67.      Google's unfair conduct also undermines public policies aimed at protecting consumers from harm, especially in digital marketplaces.  California, in particular, has a strong public policy in favor of safeguarding consumers against deceptive practices and ensuring that products and services available to the public do not pose undue risk of fraud or financial loss.  Public policy encourages protecting citizens from financial scams and fraudulent schemes, particularly in digital markets where consumers are more vulnerable.  By allowing fraudulent apps that facilitate "pig butchering" scams, Google's conduct violates public policy aimed at preventing fraud and financial exploitation.  Public policies also generally uphold the importance of transparency and truthfulness in advertising, especially when companies make safety and security claims.  Google's representations of Google Play safety create a misleading sense of security and violate policies against false advertising.  There is also a public policy interest in maintaining high standards of digital security and privacy for consumers.  Particularly given its representations to the contrary, Google's failure to vet fraudulent cryptocurrency trading apps contravenes public policies intended to ensure that digital services, especially those related to finance, do not expose users to unnecessary risk.  Public policy supports the principle that companies with substantial market control have a duty to protect users from known risks, especially where users cannot avoid these risks themselves.  Google's exclusive control over Google Play distribution heightens its duty to protect consumers, and its failure to do so conflicts with public policies focused on consumer protection in monopolized digital markets.

68.      Defendants' business practices are also unfair within the meaning of the UCL because the injury to Plaintiff and the Class is not outweighed by any countervailing benefits to consumers or competition, and the injury could not reasonably be avoided by Plaintiff and Class members.  There were reasonable available alternatives to further Defendants' legitimate business interests other than the conduct described herein.

69.     As a result of engaging in the conduct alleged in this Complaint, Defendants have also violated the UCL prohibition against fraudulent business acts or practices by representing that apps from Google Play are legitimate, safe, and secure and can be downloaded with confidence because of Google's vetting process and security standards.  Defendants' conduct as set forth fully above was false, misleading, and/or likely to deceive a reasonable consumer.  A reasonable consumer would be deceived or mislead by Google's representations because the representations regarding the legitimacy, safety, and security of Google Play apps are material to consumers' decision to purchase Google Play-enabled hardware devices (phones and tablets) and download and use Google Play apps for financial transactions and related purposes.  Plaintiff and other Class members have in fact been deceived as a result of their reliance on Defendants' material misrepresentations.

70.     Plaintiff has suffered injury in fact and lost money or property as a result of Defendants' unlawful, unfair, and fraudulent business acts and practices alleged herein.  Because of the unfair business practices at issue, Plaintiff and members of the Class have suffered an injury in fact and have lost money and property, including, but not limited to, the expected utility and performance of their Google Play-enabled devices, the purchase price of their Google Play enabled devices, and/or the difference between the price Class members paid and the actual worth of the hardware product, had Google disclosed the true nature of the representations at issue.  As a result of Defendants' misconduct and representations, Plaintiff also invested and lost thousands of dollars in a scam app he acquired through Google's Google Play.

71.     Google's conduct in violation of the UCL is ongoing and continuing to this date.  The unlawful, unfair, and fraudulent business acts and practices of Defendants described herein present a continuing threat in that Google is currently engaging in such acts and practices and will persist and continue to do so unless and until an injunction is issued by this Court.  Plaintiff intends to continue to purchase Google Play apps in the future if they are secure and comport with Google's claims regarding its standards, vetting, and review.  Because Plaintiff owns Google Play-enabled devices, and the ability to download and use apps is integral to the core functionality of the Google Play-enabled devices he owns, he has no reasonable, comparable alternatives except to download

and use apps from Google Play.  Injunctive relief, in the form of corrective advertising, is necessary to dispel public misperception about the safety and trustworthiness of apps in Google Play that has resulted from years of Google's unlawful marketing efforts and to prevent current and future Google Play-enabled product users from being misled.

72.    Plaintiff, on behalf of himself and the Class members, seeks restitution from Defendants of all money and property lost by Plaintiff and the other members of the Class investing through fraudulent financial apps acquired through Google Play and by overpaying for their Google Play-enabled hardware devices, an injunction prohibiting Defendants from continuing the unfair business practices, corrective advertising, and all other relief this Court deems appropriate, consistent with Business & Professions Code §17203.

<u>**SECOND CLAIM FOR RELIEF**</u>
**False Advertising – Cal. Bus. & Prof. Code §17500,** *et seq.*

73.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.  California Business & Professions Code §17500 prohibits any person from making or disseminating before the public any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

74.    Google disseminated, and continues to disseminate, statements to the public concerning the safety and security of the Google Play Store and the apps available therein.  These statements include, but are not limited to, representations that: (a) Google Play is a "safe and trusted" platform; (b) every app on Google Play undergoes rigorous safety review, including over 10,000 automated and human-reviewed safety checks; (c) Google Play Protect scans over 200 billion apps daily to protect users from malware and harmful applications; (d) Google does not allow apps that "expose users to deceptive or harmful financial products and services"; and (e) financial apps on Google Play comply with all applicable laws and regulations.

75.    These statements were untrue and misleading.  Google Play hosted multiple fraudulent cryptocurrency trading apps—including the Watsans app and others operated by the same or related developer accounts—that were designed solely to steal users' funds through "pig

butchering" scam schemes. These apps did not undergo the rigorous vetting Google represented, did not comply with applicable financial laws or regulations, and were not safe for consumer use.

76.    Google knew, or by the exercise of reasonable care should have known, that these statements were untrue or misleading. The fraudulent apps at issue exhibited obvious indicia of fraud that should have been detected through reasonable vetting, including deceptive developer names designed to impersonate platform endorsements, boilerplate app descriptions shared across dozens of related developer accounts, contact emails hosted on free consumer email services, and developer locations in jurisdictions inconsistent with the purported financial services offered. Moreover, Google was on notice of the proliferation of "pig butchering" scam apps on mobile platforms through widespread public reporting, law enforcement warnings, and Google's own enforcement actions against similar fraudulent developers.

77.    Google's false advertising statements were disseminated through Google's official marketing channels, including the Google Security Blog, Google Play Console Help pages, Google Play Store listings, developer policy documentation, and public press communications. These statements were made in connection with the marketing, sale, and distribution of Google Play services and the Google Play-enabled devices through which those services are accessed.

78.    Plaintiff and Class members were exposed to Google's false advertising and relied upon these statements in deciding to purchase Google Play-enabled devices, to download apps from Google Play, and to use financial apps obtained through Google Play for monetary transactions.

79.    As a result of Google's violations of Business & Professions Code §17500, Plaintiff and Class members have suffered injury in fact and lost money or property. Plaintiff, on behalf of himself and the Class, seeks restitution, injunctive relief including corrective advertising, and all other relief this Court deems appropriate, consistent with Business & Professions Code §17535.

## THIRD CLAIM FOR RELIEF

### Negligence

80.    Plaintiff re-alleges and incorporate by reference all preceding paragraphs as though fully set forth herein. Google voluntarily undertook to render app-vetting and security-review services for the benefit of Google Play users. Google's undertaking included, but was not limited

to: (a) establishing and administering a developer review process through which all apps are purportedly vetted before being made available for download; (b) deploying automated scanning and human review to detect malware, fraud, and policy violations; (c) operating Google Play Protect to continuously monitor apps for harmful activity; and (d) enforcing developer policies that prohibit apps facilitating financial fraud.  Google marketed these undertakings as core features of the Google Play platform.

81.    Google's app-vetting and security-review undertaking was of a kind that Google should have recognized as necessary for the protection of third persons—namely, the consumers who download and use apps from Google Play.  Google recognized this protective purpose, as evidenced by its own representations that its safety measures exist to protect users and to ensure that consumers can "download with confidence."

82.    Google failed to exercise reasonable care in performing its undertaking.  Despite representing that it conducts rigorous vetting of all apps, Google failed to detect or prevent the listing of fraudulent "pig butchering" cryptocurrency scam apps on Google Play, including the Watsans app and numerous substantially similar apps operated by related developer accounts.  Google's failure to exercise reasonable care is evidenced by, among other things: (a) the repeated approval of developer accounts with names styled to impersonate platform endorsements; (b) the failure to flag or investigate the repeated submission of nearly identical scam app descriptions across multiple developer accounts; (c) the failure to verify regulatory compliance for apps categorized under "Finance"; (d) the failure to investigate developer contact information that was inconsistent with the purported services offered; and (e) the failure to promptly remove or warn users about scam apps after notice of substantially similar fraud on the platform.

83.    Google's negligent performance of its voluntary undertaking increased the risk of harm to Plaintiff and the Class.  By affirmatively representing that apps on Google Play are vetted, safe, and trustworthy—while failing to exercise reasonable care in its vetting—Google lowered consumers' guard and induced them to place trust in apps that they might otherwise have scrutinized more carefully or avoided altogether.

84.    Alternatively and additionally, Plaintiff and Class members suffered harm because they relied upon Google's undertaking to vet and review apps.  Plaintiff and Class members would not have downloaded the fraudulent cryptocurrency apps, or would not have deposited funds therein, absent their reliance on Google's undertaking and its representations regarding the safety of Google Play.

85.    The harm suffered by Plaintiff and the Class was foreseeable.  Google was aware or should have been aware that "pig butchering" cryptocurrency scams constitute a significant and growing threat on mobile app platforms.  The Federal Trade Commission, the Federal Bureau of Investigation, and other law enforcement agencies have issued repeated public warnings about such scams.  Google itself has taken enforcement actions against fraudulent cryptocurrency app developers on its platform, demonstrating actual awareness of this threat.

86.    As a direct and proximate result of Google's negligent undertaking, Plaintiff and Class members suffered actual damages, including but not limited to, the loss of funds invested through fraudulent apps downloaded from Google Play, the diminished value of and overpayment for Google Play-enabled hardware devices, and consequential economic harm.

87.    Plaintiff, on behalf of himself and the Class, seeks compensatory damages, restitution, and all other relief this Court deems appropriate.

### FOURTH CLAIM FOR RELIEF

**Violation of the Declaratory Judgment Act**
**28 U.S.C. §2201, *et seq.***
**(On Behalf of Plaintiff and the Class)**

88.    Under the Declaratory Judgment Act, 28 U.S.C. §2201, this Court is authorized to declare the rights and legal relations of the parties and to grant further necessary relief pursuant to 28 U.S.C. §2202.  The Court also has broad equitable authority to restrain ongoing torts and violations of federal and state law described in this Complaint.

89.    Plaintiff therefore respectfully requests a declaration consistent with the foregoing and further necessary relief under 28 U.S.C. §2202, including the public-injunctive measures described above, together with such other and further relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of himself and the proposed Class respectfully requests that the Court enter an order:

A.    Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as representative of the Class, and appointing his counsel as class counsel;

B.    Declaring that Google's actions, as set out above, violate California's Business & Professions Code cited herein;

C.    Awarding damages, including nominal, statutory, and punitive damages where applicable, to Plaintiff and the Class in the amount to be determined at trial;

D.    Awarding Plaintiff and the Class their costs of suit, including reasonable attorneys' and experts' fees and expenses;

E.    Awarding Plaintiff and the Class pre-and post-judgment interest, to the extent allowable;

F.    Awarding such other further injunctive and declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

G.    Awarding such other and further relief as the Court deems reasonable and just.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury for all issues so triable.

Dated:  February 24, 2026          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/ John T. Jasnoch*
John T. Jasnoch (281605)
600 W. Broadway Suite 3300
San Diego, CA  92101
Telephone: 619-233-4565
jjasnoch@scott-scott.com

**TAYLOR-COPELAND LAW P.C.**
James Taylor-Copeland (284743)
501 W. Broadway, Suite 800,
San Diego, CA 92101,
Telephone: 619-734-8770
james@taylorcopelandlaw.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL